### UNITED STATES v. ROMARD et al.

(Circuit Court, S. D. New York.    August 4, 1898.)

1. HARBORS—REGULATION BY CONGRESS—DUMPING OF REFUSE.

The act of congress of June 29, 1888, as amended by the act of August 18, 1894, which prohibits the deposit of refuse and other material within the harbor of New York and other waters, within limits prescribed by the supervisor of the harbor, and which commands that such material be deposited only within limits defined in a special permit, does not unlawfully delegate any portion of the power of congress over navigation and commerce. The act, in effect, provides that scows shall be dumped only at the place or places indicated by the supervisor, and makes disobedience of his orders an offense, and is a valid exercise of police power to protect waterways from obstructive and injurious deposits.

2. SAME—PERMIT BY SUPERVISOR.

A permit prescribing that the deposit be made in not less than 15 fathoms of water, to the southward and eastward of Sandy Hook lightship, or at the "Mud Buoy" at any time during ebb tide, except the last hour, is sufficiently definite, and complies with the requirements of the act.

The defendants, who were indicted for dumping at a place other than one of those prescribed in the permit issued by the supervisor of the harbor, demurred to the indictment upon grounds discussed in the opinion.

Henry L. Burnett, U. S. Atty. (Wm. S. Ball, of counsel), for the United States.

Kellogg, Rose & Smith (Abram J. Rose, of counsel), for defendants.

THOMAS, District Judge.    Congress, by the act of June 29, 1888, as amended by the act of August 18, 1894, sought to prevent the deposit of obstructive and injurious deposits within the tidal waters of the harbor of New York and adjacent or tributary waters, by dumping or otherwise, and to punish and prevent such offenses.    The principal objection raised by the demurrer to the indictment relates to the validity of such act.    Section 1 prohibits the deposit of refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid, or any other matter of any kind, other than that flowing from streets, sewers, and passing therefrom in a liquid state, in the tidal waters of the harbor of New York, or its adjacent or tributary waters, or in those of Long Island Sound, within the limits which shall be prescribed by the supervisor of the harbor.    Section 3 requires persons proposing "to take or tow such forbidden matter to the place of deposit to apply for and obtain from the supervisor of the harbor appointed hereunder a permit defining the precise limits within which the discharge of such scows or boats may be made"; and any deviation from such dumping or discharging place specified in such permit is declared to be a misdemeanor within the meaning of the act.    It is the policy of the act that the supervisor of the harbor may prescribe limits within which the deposit of forbidden matter shall not be made, and shall prescribe by special permit in each case the precise limits within which such deposit may be made.    It is contended that congress

had power to prescribe such limits, but could not authorize the supervisor of the harbor to fix the same. The act is tantamount to a legislative direction that such deposit shall not be made within spaces prescribed by the supervisor, and shall be made within spaces prescribed by him. Under it the supervisor may withdraw certain sections of water from the injurious effects of dumping. Such preclusion of persons from dumping within designated localities, might be a sufficient protection; but the act supplements the direction for indicating prohibited sections by providing that the supervisor shall assign to each person desiring to dump in the harbor a place where the same may be done. It confided to him a power of selecting the spots where, at various times, during different years or months or days or hours, refuse might be deposited with the least injury to the use of the waters for navigation and commerce, and for the best protection of adjacent shores. The propriety of selecting one place or another might depend upon the condition of the tides, the prevalence of certain winds, the equal distribution of material, the configuration of adjoining territory, and the exposure thereof to injurious consequences. It makes provision for supervision of the actual depositing of refuse, whereby the supervisor may say to those conducting one scow, "Deposit here," and to those conducting another scow, "Deposit there," and makes a disobedience of the supervisor's command an offense. Congress did not thereby delegate to the supervisor any of its power "to regulate commerce," and the included control of the navigable waters of the United States. The supervisor is not authorized to declare that dumping refuse of various kinds is obstructive or injurious to navigation, and punishable. He is merely directed to overlook the detailed operation of such dumping, to the end that the deposit shall not be hurtful to navigation. With the same purpose, harbor masters are authorized to designate the place of anchorage of ships, and locate and shift locations as the conditions of shipping in the harbor require. Obviously, the two houses of congress and the executive could not take an immediate oversight of the dumping of scows, directing deposit in one place or another, as the exigencies of the day or hour demanded, and no general law could meet the mischief sought to be avoided; hence the mere detail of protecting the harbor was committed to a subordinate officer. It is erroneously suggested that the supervisor may declare what are obstructive and injurious deposits. The act does this, and the supervisor merely designates where such deposits may be made without obstructive and injurious effects. The shifting conditions necessitate shifting places of deposit, so that, in a sense, what is innocent at one hour may be an offense at another. But that is a mere matter of police regulation, whereby a public officer is authorized to command scows using the harbor to adapt themselves to certain transitory conditions, in a manner that may seem suitable to such officer. The act substantially provides that every scow shall be dumped only in the place or places indicated by the supervisor. It would be strange if the United States, with its power over the navigable waters, could not place a keeper over the same, with power to decide what portion of its vast domain should receive the refuse of a great city, where the pro-

priety of selecting such portion depended on ever-changing conditions. Such a power cannot be denied to it in the present instance, as it would defeat the only practicable and available means of protecting from nuisances the waters under its jurisdiction, unless, may be, by a sweeping enactment prohibiting all deposits in the harbor and within a certain distance thereof.

It is insisted that the case at bar falls within the principles enunciated in U. S. v. Keokuk & H. Bridge Co., 45 Fed. 178. In the logical opinion delivered by the learned judge in that case several propositions of present interest are stated:

(1) "The free navigation of a river is not to be interfered with or obstructed by the building of a bridge over the same by any railroad or bridge company, or by any individual citizen, acting without governmental authority; and therefore, as claimed, whoever undertakes, without specific authority, to erect a bridge over such a stream, does so at his peril, and if, when erected, it is in fact an obstruction, it may be removed for that reason." (2) "Congress might determine that, as to any given river or waterway, the navigation thereof must be left wholly free and unobstructed, and might, therefore, empower the secretary of war to cause all bridges interfering with the free navigation to be removed, or to be so constructed as not to interfere therewith. In such cases the legislative will is declared to be that the navigation of the river shall be left wholly free and unobstructed, and the secretary of war would only be charged with the duty of executing the legislative will in this particular,—a duty which must, of necessity, be intrusted to some executive agency." (3) "When, however, it becomes necessary to decide whether the public interests demand that the navigation of a river shall be subjected to some burden and obstruction in order that the other public highways of the country may be carried over the same by means of bridges, and to prescribe the nature and extent of the obstruction that may be caused to the navigation of the given waterway, there are presented legislative questions, the decision of which cannot be conferred upon any individual citizen or subordinate authority; and when congress has declared that the public interests require that the navigation of a river may be subjected to the obstruction caused by the erection of a bridge of a defined character at a fixed location, and the bridge is erected accordingly, and is thus legalized, no power short of congress acting in its legislative capacity can deprive the bridge owner of the protection afforded him by the act of congress authorizing the building and maintenance of the bridge in the first instance." (4) "Congress can confer upon the secretary of war, or other agency, the duty of ascertaining whether a given structure conforms in fact to the requirements of the act of congress authorizing its erection, and to prescribe any changes that may be needed to conform it thereto; or congress may authorize the erection of a bridge in accordance with the plans to be adopted by the secretary of war, as is held in the case of Miller v. Mayor, etc., 109 U. S. 385, 3 Sup. Ct. 228." (5) "A statute may require obedience to some proper order to be made by a named person, body, or other authority, but in that case the order to which obedience is required must be sufficiently clear and certain to notify the person addressed of what he is to do or not to do."

In that case congress had specifically authorized the bridge company to construct a bridge, and it did not appear that the construction was in violation of the terms of authorization, and the essential holding is that congress may not delegate to a subordinate discretionary authority to nullify the act, and the construction of the bridge pursuant to it. The opinion does not suggest that the United States, in its constitutional control of navigable waters, may not establish police regulations intended to prevent the deposit of material which would tend to create an obstruction of the waterway, and authorize a govern-

mental officer to supervise the manner of distributing refuse, and to designate the location of such deposit. While waterways are intended to be used for the purpose of navigation, and while a qualified right to use the same for such purpose may exist, yet there is no primary right, qualified or otherwise, to deposit obstructive material in public waters, and it is quite within the jurisdiction of congress to authorize public officers to prevent such deposit, in whole or part, or, if such deposit be suffered, to direct the supervisor of the harbor to fix the times and places when and where injurious deposits shall be made, and to command obedience to the directions of such officer. If congress may authorize the erection of a bridge pursuant to plans to be adopted by the secretary of war, it certainly may authorize what would otherwise be a nuisance to be conducted according to specific instructions adopted and promulgated by one placed in charge of the protection of waterways. It is immaterial that the plans are fixed and continuing, in the case of the bridge, for the nature of the case requires such certainty. The changing conditions already suggested require frequent, even daily, change of instructions, and it is only necessary that such instructions, when issued, be sufficiently plain and reasonable to apprise the person acting under them of the rights sought to be given or denied.

But it is claimed that the permit is void for uncertainty, and for a failure to fix precise limits within which the discharge could be made. This objection is without apparent merit. The indictment, in effect, charges the unlawful dumping, on the 8th day of April, 1898, of ashes and sweepings into the tidal waters of the harbor of New York, at a place other than that specified in the permit. It permitted the deposit to be made in not less than 15 fathoms of water, to the southward and eastward of Sandy Hook lightship, or at the "Mud Buoy," at any time during ebb tide, except the last hour. In this connection it should be recalled that the law authorizes the supervisor (1) to prescribe the limits within which dumping could be made; (2) to prescribe limits within which it could not be made. Surely he has done this. The spaces to the southward and eastward of Sandy Hook lightship were permissible places of deposit. It could not be more intelligibly stated. The indictment charges deviation. It was not necessary to state in the permit limits within which the deposit could not be made, nor to charge in the indictment that the deposit was made within limits prohibited by the supervisor. This would have brought the case under the first section. Certainly the defendants are alleged to have offended against the third section, which requires the permit to fix the limits for lawful dumping, and makes the dumping elsewhere an offense. Nevertheless, prescribing dumping grounds southward and eastward of Sandy Hook lightship necessarily excludes dumping to the northward and westward thereof, and hence fixes the limits of forbidden waters under section 1. In other words, the statute is so framed that the inclusion of certain places for dumping is the exclusion of other places for such purposes. The defendants allege that the qualified and alternative permission to deposit at the "Mud Buoy" impairs the certainty of the permit. The permit gave an alternative permission during a certain time to go to "Mud

Buoy," and deposit there.    There is no apparent indefiniteness.    The "Mud Buoy" is a fixed place, and at that place, or in reasonable contiguity thereto, the defendants could deposit.    But it is said to be void because it does not fix a limit.    Even so, the first limit would survive.    But is there not a precise limit?    The "Mud Buoy" is the central point.    About that central point the dumping could be done, and unreasonable departure could not be made therefrom.    It was not necessary to describe a circle, of which the "Mud Buoy" should be the center.    The defendants were limited to depositing at a fixed and well-known place, and it was utterly impossible for them to have been misled.

After a careful examination of the able and instructive briefs submitted herein, the conclusion is reached that the act and permit issued under it are valid, and such holding must result in the overruling of the demurrer, without discussion of some further and technical objections to the pleading.